B. P. TANKERSLEY et al., Appellants,

v.

Mrs. Sallie RANDAL, Appellee.

No. 3750.

Court of Civil Appeals of Texas.

Eastland.

Nov. 2, 1962.

Rehearing Denied Nov. 23, 1962.

Thomas F. Glover, Seymour, Bonner & Montgomery, Wichita Falls, for appellants.

Newton & Whiteside, R. J. Balch, Seymour, Ratliff & Ratliff, Haskell, for appellee.

GRISSOM, Chief Justice.

Mrs. Sallie Randal, the widow and successor in title of Charles Randal, sued B. P. Tankersley in trespass to try title to 36.3 acres of land out of Section 122 of the T. & N. O. Ry. Co. Survey in Baylor County. This 36.3 acre tract lies immediately east of the boundary line between Sections 103 and 122 and extends east in Section 122 to the west bank of the Brazos River. Said tract was included in the field notes of 131 acres out of Section 122 patented by the State to Charles Randal on March 1, 1936. The 36.3 acre tract is cut off on the west by the river from the remainder of Section 122. On the west it adjoins the east line of Section 103, a part of which section is now owned by B. P. Tankersley. (A map showing the location of the land and river is attached to this opinion.) C. A. Grossman intervened claiming title to one-half the minerals in said 36.3 acres. Only one issue was submitted to the jury. That issue and the jury's answer thereto are as follows:

"Do you find from a preponderance of the evidence that the defendant, B. P. Tankersley, and those under whom he claims either in person or by and through their tenants, have had and held the peaceable and adverse possession by actual en-

P. #3

SCHEDULE A

Section 104

T A N O   R R   C O

Section 121

Section 2, H & T C

36.3 acres

Sallie Randal

Sallie Randal

S. Hwy 183

I, O. H Bartley, Registered Public Surveyor, No. 873, do hereby certify that the foregoing plot and field notes shown in black are true and correct according to a survey made by me on the ground

April 29, 1961
Seymour, Texas

O.H. Bartley

closure thereof, of the land in controversy in this suit, cultivating, using, or enjoying the same, under a claim of ownership, continuously for any consecutive period of ten (10) years prior to the filing of this suit on the 20th day of June, 1958?—Answer: No."

Judgment was rendered awarding title and possession of the 36.3 acres to Mrs. Randal. Tankersley and Grossman have appealed.

Appellants' first point is that the court erred in refusing to disregard the jury's answer to said issue because the evidence conclusively established that Tankersley and those under whom he claims have had peaceable and adverse possession by actual enclosure of the tract, cultivating, using and enjoying the same, under a claim of ownership, continuously for a period of ten years prior to the filing of this suit on the 20th of June, 1958, and that the undisputed evidence shows that McDonald and C. A. Grossman, the latter being the immediate predecessors in title of Tankersley, had such adverse possession for more than ten years prior to delivery of possession to Tankersley. Appellants' second point is that said jury finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust.

Under said points appellants say that a portion of Section 122, which included the 36.3 acres in controversy, was sold by the State of Texas to Charles Randal on October 7, 1901, upon his application filed in the Land Office on September 12, 1901, for $1.00 per acre; that said land was classified as grazing land and, after due proof of occupancy and payment in full by Charles Randal, it was patented to Randal on March 31, 1936; that after it was sold to Randal, but before the patent was issued to him, Randal executed a quitclaim deed to D. M. Ellison covering the land in controversy and Ellison, on June 26, 1903, conveyed same to A. H. Jeter. They say it is not shown that Jeter or anyone claiming under him ever divested themselves of the property in controversy; that Charles Randal died testate and all of his property is now owned by his widow, Sallie Randal, who is the appellee. They point out that L. A. Webb testified that in 1905 or 1906 he helped his father, who worked for A. H. Jeter, build a fence along the river on the land in controversy; that the land in controversy and Jeter's land in Section 103 were in one enclosure and there was no fence between Sections 103 and 122; that C. M. Randal, son of the plaintiff and Charles Randal, deceased, testified that originally the Randal's west fence was along the section line between Sections 103 and 122, and that about 1900 his father, Charles Randal, built a fence along both banks of the river but that a fence remained between said sections; that C. M. Randal moved off the farm in 1904 and his father continued to run cattle on all of Section 122 until about 1915, since which time all of Section 122 has been continuously rented or leased by the Randals; that he did not know whether the Randal tenants, except Fancher, who also leased the lands now owned by appellants in Section 103, ever actually ran cattle on the land in controversy; that he did not see the fence between Sections 103 and 122 from about 1908 until 1956, and that sometime between those years that fence disappeared; that Bowman testified that he moved on the Randal land in Sections 121 and 122 with his father in about 1925; that the west boundary of the Randal land was then the west line of Section 122; that there was then a fence on the line between Sections 122 and 103, as well as a fence on the river; that the fence was on the line between Sections 122 and 103 in 1933 and in 1951, but that it has since disappeared; that when he lived on the Randal land prior to 1933, J. M. Jeter owned the land in Section 103 west of the Randal land; that Harmon Hogue testified that he moved on the Randal land after Bowman left in 1933, and that there was then a fence on the line between Sections 122 and 103 but there was no fence on the river, except one which enclosed a few acres on the northwest

corner; that in 1937, he helped Mr. Grossman, who then owned land in Section 103, repair the section line fence because Grossman's cattle were getting out and coming on his place east of the river; that he had a fence on the east side of the river and did not use the land on the west side of the river; that A. H. Jeter and wife, who in 1903 acquired land in Section 103, died prior to 1917 and in 1917 the property adjoining the land in controversy on the west was conveyed to J. M. Jeter; that J. M. Jeter testified that when he acquired the land west of the river in Section 103 there was a fence which pretty well followed the river bank; that in 1927, J. M. Jeter and wife executed a trustee's deed to portions of Section 103 adjoining the land in controversy and that the land covered by said deed of trust was sold to Mrs. Kate Liles at a Trustee's Sale in 1930; that in 1934 C. H. McDonald and C. A. Grossman, one of the appellants, were conveyed the J. M. Jeter land and the Kate Liles' land, all of which is in Section 103 and adjoins the land in controversy on the west, and that in 1942 McDonald sold his interest to Grossman; that Grossman testified that, while he had the land in Section 103, the strip of land in controversy was fenced in with other lands in Section 103 and there was no fence between Sections 122 and 103; that on July 9, 1949, Grossman executed and delivered to B. P. Tankersley a deed conveying all the surface and one-half of the minerals in a portion of Section 103 which adjoins the land in controversy on its west; that Tankersley testified that before purchasing Grossman's land in Section 103, he walked over the land and there was a fence along the river but none dividing Sections 103 and 122; that J. M. Jeter testified that his father and Charles Randal had some kind of agreement about the land in controversy and that he knew the Randals owned some land in Grossman's pasture west of the river but that when he sold his land in Section 103 to Grossman and McDonald he didn't tell them anything about anyone owning land within his fences; that Grossman testified that he and McDonald and later he

alone ran cattle on the west side of the river on the property in controversy; that the fence along the river bank was capable of turning cattle and that he repaired the river fence and was never told that anyone owned any land in his pasture and he had never heard of such a claim until this suit was filed in 1958, which was after he sold his land to Tankersley. Appellants admit that the Randals have always paid the taxes on the land in controversy.

From the foregoing, appellants conclude that it is undisputed that there has been and still is a fence along the river on the east side of the land in controversy; that said land was enclosed by a fence with land in Section 103 now owned by Tankersley, and that the fence was capable of turning cattle; that those who have owned that portion of Section 103 adjoining the land in controversy on the west, or their tenants, have used and occupied the 36.3 acres in controversy for grazing purposes since 1915; that Grossman and McDonald used and claimed it from 1934 until 1949 and that there was privity of possession of the 36.3 acre tract between such former owners and their successors. From which appellants conclude that the evidence established their title to the 36.3 acres under the ten year statute of limitation or, in the alternative, that the jury finding to the contrary is against the great preponderance of the evidence.

The appellee says that the evidence merely raised an issue of fact as to appellants' limitation title. In her brief, appellee discusses the testimony pointed out by appellants but stresses the following as showing that appellants did not conclusively establish limitation title and that the finding against them is not contrary to the overwhelming weight and preponderance of the evidence. She points out that Bowman testified that he lived on the Randal land, including Section 122, of which the 36.3 acres is a part, from 1925 to 1933; that his father rented the farm land and leased the pasture land from the Randals and that when he moved there was a fence between

Sections 103 and 122 and the Randals were running cattle on all of Section 122; that there was also a fence along the river; that after 1933, he next saw the 36.3 acres in 1951, and there was still a fence on the section line but that he went back there about three years before the trial and the stays and corner markers were gone; that Hogue testified that he moved on the Randal land after Bowman left and a fence was then between Sections 122 and 103; that in 1937, he and Grossman repaired that fence; that when he left the Randal ranch in 1942 he thought that fence was still there. She points out evidence that the Randals ran cattle on all the Randal land, in Sections 121 and 122, including that in dispute, when they first moved there in 1898, and that ever since they left the ranch they have leased the 36.3 acres in dispute with the rest of their land; that there is no water on the 36.3 acre tract; that the Randals leased it along with other land for oil and gas development; that they executed an easement thereon in favor of the Sun Oil Company so that it could get to the Tankersley land to drill an oil well; that Tankersley gave Sun an easement but that it did not cover any of Section 122; that on November 7, 1950, Tankersley and Grossman leased their 307.68 acres in Section 103 to the Sun Oil Company and that lease did not purport to cover any part of Section 122; that Dr. Charles Randal has had the land in dispute leased, along with the remainder of Section 122, since 1956; that it is undisputed that the Randal family has always paid the taxes on the 36.3 acres; that Grossman paid taxes on the land his deeds called for but he never rendered or paid taxes on the 36.3 acres; that Jeter never rendered or paid taxes on it and that Tankersley has never rendered or paid taxes on the land in dispute. Although denied by Tankersley, C. M. Randal testified that in the latter part of 1949, or the first part of 1950, Tankersley admitted that the Randals owned some land "over there" and that both of them said they would like to have the land surveyed. In none of the conveyances affecting Tankersley's 307.68 acres in Section 103, is there

any reference to the 36.3 acres in dispute. When J. M. Jeter sold land in Section 103 to McDonald and Grossman, according to Jeter, he sold only the land his deed described; that he knew someone owned some land in Section 122 which was enclosed in his pasture and he thought it was the Randals; that his daddy and Mr. Randal were good friends.

Although Grossman and Tankersley testified that they claimed the land "from fence to fence" neither testified to assertion of any claim to the land in dispute until about the time this suit was filed, or to any facts evidencing it, or offered any evidence tending to prove such a claim, except such as might be evidenced by having it enclosed by a fence with Section 103. Appellee says that there was no privity of possession of the disputed tract; that there is nothing in the record to show that the claim of the earlier possessors was transferred to the later occupants by contract, or otherwise, and that privity was not established; that mere occupancy by different persons is not sufficient. The court charged the jury that privity of estate existed between successive occupants or possessors of the land when the earlier occupants' possession and claim passed, or was transferred, to the later occupants in an unbroken chain, by agreement, gift, devise or inheritance. Appellee says that the evidence failed to establish privity of estate. We are forced to the conclusion that privity was not established. Jeter, who sold to McDonald and Grossman, testified that he never claimed the 36.3 acres; that he did not sell the 36.3 acres to them and that he did not sell them any possessory rights he might have acquired by the 36.3 acres being within his fence; that he just sold Grossman and McDonald the land their deed described, all of which was in Section 103 and did not include the 36.3 acres in Section 122. Nor was it conclusively established that McDonald and Grossman, the latter being Tankersley's vendor, adversely claimed the 36.3 acre tract or transferred such claim. Randal's testimony indicates that after

Tankersley purchased from Grossman land in Section 103, Tankersley acquiesced in Randal's claim of ownership of land in his enclosure and that later, when Tankersley assumed a different attitude, Grossman told Randal he would talk to Tankersley and get him to change from his then asserted claim to all the land within his fence. If a claim of ownership of the 36.3 acres by Tankersley or his predecessors in title for 10 consecutive years before the filing of this suit in 1958 was established, it had to be the claims of McDonald and Grossman. We cannot say that the record conclusively shows that they adversely claimed the disputed tract for the requisite period. As to that, the minds of reasonable men can certainly differ. We think the jury finding is not contrary to the overwhelming weight and preponderance of the evidence.

We concur with appellee's contention that appellants' testimony that they claim the land from fence to fence concerns a mental process or opinion which does not evidence an open, visible act manifesting an intention to claim the land adversely. Appellee quotes, as applicable to this situation the following from Delany v. Padgett, 5 Cir., 193 F.2d 806, 810.

"These same authorities do, though, make it perfectly clear that the claim of right referred to in the statutes means a bold and open, a downright and persistent claim asserted not furtively by stealth and artifice, but openly, notoriously, unequivocally, adversely and continuously. Because this is so, the decisions under these statutes take pains to leave in no doubt that if there is any break or chink in the armor of proof which a possessor must put and keep on when he undertakes to acquire a title by limitation, such as a single lisp of acknowledgment, the slightest uncertainty or equivocation in the openness and downrightness of his claim, a failure to comply precisely and exactly with the statutory provision, it is, and will be, fatal to the claim."

C. M. Randal testified that his father built the river fence. Neither appellants nor those under whom they claim placed any improvements on the 36.3 acres. There is no water on it. Jeter didn't claim it. He didn't convey any right he might have acquired by it being enclosed within the same fence with his land in Section 103, which he sold to Grossman and McDonald. Randal's testimony alone raised an issue of fact as to Grossman's and Tankersley's adverse claim of the disputed tract for the requisite time. In a suit for title to a tract of land which is not included in the description of the purchased property, but is claimed by adverse possession, possession of the claimant cannot be tacked to that of his predecessor in title to prove possession for the statutory period unless his predecessor claimed the land and transferred such claim. Art. 5516; Overton Refining Co. v. Harmon, Tex.Civ.App., 81 S.W.2d 207, affirmed 130 Tex. 365, 110 S.W.2d 555, 557; Miller v. Roberson, Tex.Civ.App., 165 S.W.2d 469 (Writ Ref.); Cauble v. Halbert, Tex.Civ.App., 254 S.W. 407; Pierce v. Camp, Tex.Civ.App., 30 S.W.2d 807 (Writ Ref.); 2 Tex.Jur.2d 154, 155.

Appellants' remaining points are to the effect that no issue was submitted to the jury as to plaintiff's title to the 36.3 acres and none was requested; that record title was her only ground of recovery and, since it was not conclusively established, it was waived and, therefore, judgment should have been rendered for appellants. Appellants say that the portion of Section 122 which included the 36.3 acre tract was awarded to Charles Randal on October 7, 1901, upon his application filed in the Land Office on September 12, 1901, said land being classified as grazing land, but that after it was sold to Charles Randal and before the patent was issued to him, Randal executed a quitclaim deed dated May 30, 1903, to D. M. Ellison covering the land in controversy; that in June, 1903, Ellison conveyed the same land to A. H. Jeter; that said deeds were recorded in Baylor County but were not recorded in the General

Land Office; that there is no conveyance of record showing that A. H. Jeter, or any one claiming under him, divested himself of the land in controversy and, therefore, the evidence fails to show title in the Randals or that, at least, a question of fact was raised as to Mrs. Randal's title and, therefore, judgment should have been rendered for appellants.

▆ Appellee replies that record title to the 36.3 acres was conclusively established in her and, therefore, she was entitled to judgment, unless her title was defeated by the defendants' claim of title under the ten year statute of limitation. Appellee says it is undisputed that her husband, Charles Randal paid for the land and the State issued a patent to him; that appellee is the sole beneficiary of Charles Randal's will, by virtue of which she became the owner of the land in fee simple. The record shows that Charles Randal filed in the Land Office on September 12, 1901, an application to purchase a tract of land that includes the 36.3 acre tract; that it was classified as grazing land and purchased as an addition to his home on Section 121; that on February 7, 1908, Randal made proof of occupancy by an affidavit which recited that he was the owner and had been an actual settler with his family, in good faith, making his home on said land from December 8, 1898, until October 15, 1904; that after his proof of occupancy was filed in the Land Office in 1908, he conveyed to Wall 40 acres out of said tract; that a certified copy of that conveyance was filed in the Land Office in 1910, and the land conveyed by said deed was taken out of the original sale to Randal and set up in a separate account in Wall's name; that there remained in Randal's name in the Land Office, under the applicable file, all of said tract except said 40 acres; that A. D. Kerr, the Baylor County surveyor, surveyed and compiled field notes showing Randal's purchase to consist of 131 acres; that before Randal made proof of occupancy in February, 1908, that is, on May 30, 1903, Charles Randal

quitclaimed to D. M. Ellison 80 acres which included the 36.3 acre tract. This quitclaim deed was filed for record in Baylor County in June, 1903. The consideration recited in said deed was $25.00 and the grantee's assumption and agreement to pay and fully discharge the balance due the State. The conveyance to Ellison was never filed in the Land Office. Thereafter, Ellison quitclaimed the same land to A. H. Jeter. This deed was not filed in the Land Office. It is undisputed that Randal paid the State in full for the 131 acres, including the 80 acres quitclaimed to Ellison on March 20, 1936, and that a patent therefor was issued to Randal on March 31, 1936. The 36.3 acres in controversy is a part of this 80 acre tract. The statutes in effect at said time contemplated that a sale of public free school lands should be made only to those purchasing for a home who were actual settlers thereon and who otherwise complied with the law. The Acts of the 24th Legislature, General Laws of Texas, 1895 (Gammel's Vol. 10, pages 793, 795, 796), set out the procedure to be followed when any part of the purchased land was sold. All purchasers were required to reside upon the land, as a home, for three consecutive years, next succeeding the date of purchase. They were required to make proof of occupancy. A subsequent vendee was required to file his own obligation with the Commissioner of the General Land Office, together with a duly authenticated conveyance from the original purchaser, and any intermediate vendee's conveyance. The law provided that when such provisions had been complied with, the obligation of the original purchaser would be surrendered and his vendee would thereupon become the purchaser direct from the State and be subject to all the obligations and penalties prescribed by the statute and that the original purchaser should be absolved from further liability. In Hardman v. Crawford, 95 Tex. 193, 66 S.W. 206, 208, the Supreme Court said that

" * * * the state allows an actual settler to be substituted by another with

the same qualifications, and performing the same duties, but there is no provision by which land once sold to and occupied by an actual settler can be transferred, before the expiration of three years' occupancy, to another person, unless the state at the same time acquires another actual settler in place of the one that is released."

See also Eriksen v. McWhorter, 108 Tex. 390, 194 S.W. 588; Dugat v. Means, Tex. Civ.App., 91 S.W. 363 (Writ Ref.). The requisite three years' occupancy had not been completed when Randal quitclaimed the 80 acres to Ellison. Neither Ellison nor Jeter were actual settlers on the land in dispute, neither filed with the Commissioner the required obligations, authenticated conveyances or proof of occupancy; they failed to comply with the statute and Randal remained indebted to the State as the original settler and purchaser. The failure of Ellison and Jeter to comply with the statutes was fatal to any claim they had to the land in controversy. In Spence v. Dawson, 96 Tex. 43, 70 S.W. 73, 74, the court in holding that Franklin, the vendee of a purchaser from the State, did not get title by his deed, said

"But the evident legislative policy has been to sell the lands to actual occupants, and thereby secure the settlement of the country, and a consequent enhancement in value of the lands unsold, and therefore it can hardly be said that such policy may not have actuated the legislature in limiting the right of purchasers to sell their lands to actual settlers. But however difficult it may be to see a reason for the restriction, we think the provisions of the statute are so definitely expressed as to leave no doubt as to what was intended by them. For the reason that, when Franklin took a conveyance of section 6 from Taylor, he did not settle upon that section, and did not otherwise comply with the provisions of the statute already quoted, we conclude

that he acquired no title by virtue of that conveyance."

It is not contended that either Ellison or Jeter were actual settlers on the land or that they complied with the statutory requirements regulating a purchase of public school land from the original purchaser from the State. The provisions of the validating act did not apply to them. We conclude that neither Ellison or Jeter acquired title to the land in controversy by his deed. There is no contention that as substitute purchasers they complied with the statutory requirements. See Payne v. Cox, Tex.Civ. App., 143 S.W. 336, affirmed 107 Tex. 115, 174 S.W. 817.

■ Appellants contend that the Legislature validated A. H. Jeter's title to the disputed tract by the Acts of the 35th Legislature, 1917, Chapter 95, Page 255. That statute assumed that land purchased from the State has been properly transferred in the Land Office from the original purchaser to his vendee and that the assignee has complied with all requirements regulating the sale of public school lands to a substitute purchaser. Under the statute, the substituted purchaser had to file his transfer in the General Land Office, together with his affidavit and purchase money obligation and become the purchaser from the State. Randal's conveyance to Ellison and Ellison's to Jeter did not vest in said grantees any title to the land that would support an action to recover it, but merely gave the right to apply for purchase of the land upon the conditions stated in the statute. The validating statute applied to an assignee who was eligible to purchase public school land, who actually settled on the land and timely made payment to the State. Neither Ellison nor Jeter complied with the law governing substitute purchasers, nor the requirements of the validating statute. Neither was shown to be a qualified purchaser and actual occupant. They did not pay the State for the land. They did not pay taxes thereon. Randal, the original purchaser, completed the requisite occupancy after

such conveyances, paid the State for the land, paid the taxes thereon and it was patented to him in 1936. We conclude that record title was established in Mrs. Randal. The judgment is affirmed.